[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 21-11982

————————————

RALPH HARRISON BENNING,

Plaintiff-Appellant,

*versus*

COMMISSIONER, GEORGIA DEPARTMENT OF CORRECTIONS

MARGARET PATTERSON,
Georgia Department of Corrections,
JENNIFER EDGAR,
Georgia Department of Corrections,

Defendants-Appellees,

GEORGIA DEPARTMENT OF CORRECTIONS
INMATE EMAIL CENSOR,

                                                    Defendant.

———————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:18-cv-00087-TES-CHW

———————————————

Before JORDAN and ROSENBAUM, Circuit Judges, and
SCHLESINGER,[*] District Judge.

JORDAN, Circuit Judge:

An email, as the term itself implies, is a message, note, or
letter sent by electronic means over a computer system. *See, e.g.,*
The American Heritage Dictionary of the English Language 582
(4th ed. 2009). The questions presented in this appeal largely re-
volve around how emails generated by inmates in the custody of
the Georgia Department of Corrections are to be treated for pur-
poses of the First Amendment and the Due Process Clause of the
Fourteenth Amendment.

———————————

[*] The Honorable Harvey Schlesinger, United States District Judge for the Mid-
dle District of Florida, sitting by designation.

## I

An inmate in a Georgia Department of Corrections facility is "allowed to send emails through JPay kiosks . . . or through Georgia Offender Alternative Learning ('GOAL') devices which are provided to [inmates]." D.E. 64-4, Exh. B at 3. JPay Kiosks and GOAL devices are electronic devices used for, among other things, "sending and receiving email messages." D.E. 64-4, Attachment B-1 at 10. Each email costs 37 cents to send, with the GDC receiving 15% of the fees. *See* D.E. 64-3, Exh. A at 38.

One of the GDC's Standard Operating Procedures, SOP 204.10, governs the use of JPay Kiosks and GOAL devices. SOP 204.10, which became effective on August 15, 2017, "explains the rules and sanctions that can be imposed if a [GOAL] device or [JPay] Kiosk is misused." D.E. 64-4, Attachment B-1 at 10. It sets out, among other things, 16 policies governing video visitations and emails. Two of those policies are relevant here: (1) "[o]ffenders shall not request emails to be forwarded, sent, or mailed to others;" and (2) "[c]ustomers and offenders shall not request or send information on behalf of or about another offender." *Id.* at 14–15.

Under SOP 204.10, "[a]ll communications sent or received via the GOAL device or the [JPay] Kiosk are subject to inspection and review for security reasons, and neither the sender, nor receiver, has an expectation of privacy in any of these communications." *Id.* at 13. Any communications that violate SOP 204.10 "will be intercepted without explanation and no refund will be provided to the sender." *Id.* at 15. The screening and review of inmate

emails is conducted by analysts at the GDC's Central Intelligence Unit through an intranet system. *See* D.E. 64-4, Exh. B at ¶¶ 16–19.

## A

Ralph Harrison Benning is serving a life sentence in Georgia and is in the custody of the GDC. As an inmate, his communications with those on the outside are governed by GDC policies and regulations.

In September and October of 2017, Mr. Benning attempted to send three emails to his sister, Elizabeth Knott—one on September 24, 2017, and two on October 9, 2017. Those emails were intercepted by the GDC and never delivered to Ms. Knott due to violations of SOP 204.10. All three emails were about gang problems and fraud and corruption in the GDC.

Margaret Patterson, a GDC analyst, intercepted the September 24 email because Mr. Benning had asked Ms. Knott to forward it to third parties. *See* D.E. 64-6, Exh. D at ¶¶ 11–13. Jennifer Edgar, another GDC analyst, intercepted the October 9 emails for the same reason. *See* D.E. 64-5, Exh. C at ¶¶ 10–12. Neither Ms. Patterson nor Ms. Edgar notified Mr. Benning that his emails had been intercepted and withheld. Nor did they give him an opportunity to appeal their decisions to a different GDC official. *See, e.g.,* D.E. 80-5 at ¶ 14.

Another email Mr. Benning tried to send, this time to the Aleph Institute on February 6, 2018, was similarly intercepted and

never sent.  *See* D.E. 64-4, Exh. B at ¶ 27.   In this email, Mr. Benning discussed receiving a declaration and a "Kosher Authorities Template," and expressed gratitude.  *See* D.E. 64-4, Attachment B-3 at 21.  But he also asked that another inmate's address be "corrected to show he is now at Wilcox State Prison."  *Id.*  GDC analyst Romita Keen intercepted this email because it "contained information about another inmate."  D.E. 64-4, Exh. B at ¶ 27.  Ms. Keen did not inform Mr. Benning that the email had been intercepted, and did not give him the opportunity to appeal her decision to a different GDC official.

Mr. Benning mailed Ms. Knott handwritten copies of the emails he had tried to send her in September and October of 2017.  *See* D.E. 64-3, Exh. A at 74–75.  To Mr. Benning's knowledge, his sister received those letters.  *See id.* at 76.  Mr. Benning did not send a handwritten version of his February 2018 email to the Aleph Institute.  *See* D.E. 80-5 at 4.

## B

In 2018, Mr. Benning filed a *pro se* civil rights suit pursuant to 42 U.S.C. § 1983.  His complaint named the GDC Commissioner (then Gregory Dozier, now Timothy Ward) and Ms. Patterson and Ms. Edgar—the GDC analysts who had intercepted his emails in September and October of 2017—as defendants.  It did not name Ms. Keen—the GDC analyst who intercepted the email to the Aleph Institute in February of 2018—as a defendant.

Mr. Benning alleged that the GDC, Ms. Patterson, and Ms. Edgar unconstitutionally censored certain emails he tried to send, and failed to provide him notice, thereby violating his rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment. He requested specific declaratory and injunctive relief, as well as compensatory, nominal, and punitive damages.

The defendants filed a motion for summary judgment. They argued in part that Mr. Benning did not have a constitutional right to communicate through email and that, even if he did, the interception and withholding of his emails was constitutional. Ms. Patterson and Ms. Edgar also asserted that they were entitled to qualified immunity from Mr. Benning's claims for damages.

The district court granted summary judgment in favor of the defendants. Mr. Benning appealed, and counsel thereafter appeared on his behalf.

## II

We review questions of constitutional law *de novo*. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1239 (11th Cir. 2018). The same plenary standard governs our review of the district court's grant of summary judgment. *See Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). Summary judgment is warranted "when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in

favor of the moving party." *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1307 (11th Cir. 2013) (citation omitted).

We first address Mr. Benning's Fourteenth Amendment due process claims, and then turn to the First Amendment claims.

## III

As noted, in September and October of 2017 Ms. Patterson and Ms. Edgar censored (i.e., intercepted) three emails which Mr. Benning sought to send to his sister. They did so because the emails violated SOP 204.10's prohibition against requesting forwarding to third parties. Mr. Benning alleged that Ms. Edgar and Ms. Patterson did not provide him with any notice that his emails had been intercepted and were not going to be sent, and did not provide him with an opportunity to appeal their decisions to a different GDC official. He alleged that these failures violated his Fourteenth Amendment due process rights.[1]

The district court entered summary judgment against Mr. Benning and in favor of Ms. Patterson and Ms. Edgar on the due process claims. The court concluded that Mr. Benning did not have

---

[1] Mr. Benning also alleged that a fourth email, the one he sent in February of 2018 to the Aleph Institute, was intercepted and withheld because it violated SOP 204.10's prohibition against discussing another inmate's information. The summary judgment record indicates (and Mr. Benning does not dispute) that this email was withheld by Ms. Keen, another GDC analyst. *See* D.E. 64-4, Exh. B at ¶ 27; Br. for Appellant at 19. Mr. Benning, however, did not name Ms. Keen as a defendant.

any protected liberty interest in the emails he generated because emails should not be treated the same as outgoing physical mail. And without such a liberty interest, he was not entitled to any due process protections when his emails were censored. *See* D.E. 108 at 26–27. The court also ruled that Ms. Edgar and Ms. Patterson were, in any event, entitled to qualified immunity on Mr. Benning's due process claims. Even if Mr. Benning had a liberty interest in the emails he generated, the law to that effect was not clearly established in September and October of 2017, when the three emails to his sister were censored. *See id.* at 27–28.

We hold that Mr. Benning had a protected liberty interest in his outgoing emails, and as a result he was entitled to notice and other procedural safeguards when the three emails to his sister were intercepted and withheld. But we agree with the district court that Ms. Edgar and Ms. Patterson are entitled to qualified immunity on Mr. Benning's due process claims for damages because the law to that effect was not clearly established in September and October of 2017.[2]

## A

The first question is whether Mr. Benning had a liberty interest in his emails that triggered due process protections. *See Dorman v. Aronofsky*, 36 F.4th 1306, 1315 (11th Cir. 2022) ("Before

---

[2] We address the merits of the due process claims because, as explained later, Mr. Benning's requests for declaratory relief as to those claims are not barred by qualified immunity.

addressing what process is due, we first examine whether Mr. Dorman has a liberty interest that triggers due process protections."). We conclude that he did.

The Supreme Court has held that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment. As such, it is protected from arbitrary governmental invasion." *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413–414 (1989). As we have explained, under *Martinez* "both prisoners and their correspondents have a liberty interest in uncensored communication by letter[.]" *Perry v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 1359, 1367 (11th Cir. 2011). *See also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 500 (1952) ("[T]he liberty of speech and of the press which the First Amendment guarantees against abridgment by the federal government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action.").

When an inmate's outgoing correspondence is censored, *Martinez* requires prison officials to provide certain procedural safeguards to satisfy the Due Process Clause. Here is how we have described those safeguards: "(1) the inmate must receive notice of the rejection of a letter written by or addressed to him; (2) the author of the letter be given 'reasonable opportunity to protest that

decision,' and (3) 'complaints be referred to a prison official other than the person who originally disapproved the correspondence.'" *Perry*, 664 F.3d at 1368 & n.2 (quoting *Martinez*, 416 U.S. at 418–419).[3]

This case, of course, involves the censoring of emails rather than physical letters.  So, like the district court, we must decide whether emails are the equivalent of physical letters for purposes of a liberty interest.

We conclude that under *Martinez* Mr. Benning had a protected liberty interest, grounded in the First Amendment, in the emails he generated and sought to send to his sister. We do so for a number of reasons.

First, those emails—which contained communications from Mr. Benning to his sister—undoubtedly constituted speech under the First Amendment.  The First Amendment "protects material disseminated over the [I]nternet as well as by the means of communication devices used prior to the high-tech era." *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1151 (9th Cir. 2000) (citing *Reno v. ACLU*, 521 U.S. 844, 868 (1997)).  *See also* Jeremy Harris

---

[3] In a later case, the Supreme Court limited *Martinez* "to regulations concerning outgoing correspondence." *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).  Because Mr. Benning's intercepted emails were outgoing communications, *Martinez* governs the Fourteenth Amendment due process claims.

Lipschultz, Free Expression in the Age of the Internet: Social and Legal Boundaries 202 (2000) ("Sometimes, computer-based communication approximates a letter.  In other situations, it is like a business memorandum.  At still other times, it is like a telephone call."); Brennen J. Johnson, *Jail (E)Mail: Free Speech Implications of Granting Inmates Access to Electronic Messaging Services*, 11 Wash. J.L., Tech. & Arts 285, 290 (2016) ("Internet communications, such as emails, presumptively fall within the ambit of free speech protections.").  And the Supreme Court has told us that First Amendment scrutiny is not more relaxed in cyberspace.  *See Reno*, 521 U.S. at 868 (explaining that the justifications permitting regulations of speech in the broadcast medium "are not present in cyberspace").

Second, it seems to us that the rationale of *Martinez* is concerned with correspondence from inmates, regardless of the form (or medium) the correspondence takes.  *See Bonner v. Outlaw*, 552 F.3d 673, 677 (8th Cir. 2009) ("Although [*Martinez*] discusses letters, that is because letters were simply the form of correspondence at issue in that specific case. Nothing about the reasoning of [*Martinez*] justifies treating packages differently than letters for purposes of the notice that should be given an inmate when correspondence addressed to that inmate is rejected."). As the Eighth Circuit persuasively explained in rejecting an argument that *Martinez* applies only to letters and does not govern packages, the "reasoning of [*Martinez*] applies to all forms of correspondence addressed to an inmate.  It is the inmate's interest in 'uncensored

communication' that is the liberty interest protected by the due process clause, regardless of whether that communication occurs in the form of a letter, package, newspaper, magazine, etc." *Id.* We have applied *Martinez* to magazines, *see Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 976–77 (11th Cir. 2018), and other circuits have done the same with similar forms of communication. *See Frost v. Symington*, 197 F.3d 348, 353–54 (9th Cir. 1999) (holding that inmate was entitled to notice that his incoming magazines were being withheld by prison authorities); *Montcalm Pub. Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996) (applying *Martinez* to magazines); *Moyler v. Fannin*, 2023 WL 2541131, at *7–8 (W.D. Va. Mar. 16, 2023) (applying *Martinez* to photographs).

In the 1970s, when *Martinez* was decided, correspondence consisted only of physical letters (or similar notes or messages) handwritten or typed on paper and sent by regular mail. Today, almost 50 years later, correspondence is not so limited and emails serve as the electronic equivalent of physical letters (i.e., correspondence). *See* Johnson, *Jail (E)Mail*, 11 Wash. J.L., Tech. & Arts at 288 (explaining that by 2017 the number of email accounts was expected to rise to 4.9 billion). Thanks to computers and the Internet, we can now correspond with others digitally through email, and for due process purposes it makes both doctrinal and practical sense to treat outgoing email the same as physical letters. *See, e.g., Tory v. Davis*, 2020 WL 2840163, at *4 (W.D. Va. June 1, 2020) ("[A]n inmate has a due process right to receive notice when his email communication has been censored."). Just as the Fourth

Amendment protects against searches by technology unknown in the 18th century, *see Kyllo v. United States*, 533 U.S. 27, 34–38 (2001), the First Amendment protects correspondence transmitted by means developed in the 20th or 21st centuries.

Third, GDC officials themselves treat outgoing emails from inmates like physical letters for screening and review. Inmate emails are not immediately transmitted to their intended recipients, but instead go to the Central Intelligence Unit for screening and inspection by way of an intranet system. Emails are sent on their way only when GDC analysts at the Unit are satisfied that they comply with SOP 204.10.

In other words, just as a physical letter is not immediately delivered when an inmate places it in the prison's mail system, an email is not immediately transmitted as soon as an inmate hits "send." SOP 204.10 makes clear that "[b]ecause of the need" for inspection, email "communications may not be received by the intended recipient on the same day as sent by the sender." D.E. 64-4, Attachment B-1 at 13. From the perspective of the GDC, emails are the functional equivalent of letters written or typed on paper. And we can think of no persuasive reason why prison officials should not be required to provide notice and other procedural safeguards when they intercept or otherwise censor emails sent by inmates.[4]

_____

[4] In his concurring opinion, our colleague suggests that other circuits have applied *Turner v. Safley*, 482 U.S. 78 (1987), rather than *Martinez*, in addressing

## B

The defendants argue that Mr. Benning did not have a protected liberty interest because using the email system is a privilege, and not a right, for inmates in the custody of the GDC. *See* Br. for Appellees at 39–40. This argument misses the mark, and does so by the proverbial country mile. For over 50 years the Supreme Court has "fully . . . rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972). "[T]he question," therefore, "is

---

the due process claims of inmates whose mail has been censored or intercepted, and he argues that we should do the same. With respect, we think our colleague is mistaken. The cases he cites involve substantive First Amendment challenges to the actions of prison officials in censoring or withholding mail, and not procedural due process claims arising from the failure of such officials to provide inmates with safeguards like notice. *See, e.g., Bacon v. Phelps*, 961 F.3d 533, 543–44 (2d Cir. 2020) (addressing First Amendment protection afforded to outgoing letter for which inmate was disciplined).

As far as we can tell, no federal court has applied *Turner* in the due process context. That is not surprising, for *Turner* does not govern the procedural due process claims of inmates. *See* Laura Rovner, *On Litigating Constitutional Challenges to the Federal Supermax: Improving Conditions and Shining a Light*, 95 Denver L. Rev. 457, 479 (2018) (explaining that *Turner* does not apply to "procedural due process issues" in the prison setting). Indeed, the Supreme Court's more recent due process cases involving inmates do not apply *Turner*. *See, e.g., Wilkison v. Austin*, 545 U.S. 209, 224–230 (2005) (applying framework from *Matthews v. Eldridge*, 424 U.S. 319 (1976), to determine the process due to inmates whom the state seeks to place in so-called "supermax" prisons).

not whether a person has a right to something denied by the government, but whether the government acted lawfully in depriving him of it." *Thompson v. Gallagher*, 489 F.2d 443, 446 (5th Cir. 1973).[5]

As a result, whether Mr. Benning had a free-standing constitutional or statutory right to use the GDC email system does not affect or resolve the procedural due process question under *Martinez*. In any event, it is the First Amendment—and not state law—which creates a liberty interest here. *See Martinez*, 416 U.S. at 418. And as we have explained, email is a form of correspondence.

## C

We next take up whether Ms. Patterson and Ms. Edgar denied Mr. Benning his due process rights under *Martinez.* On this summary judgment record, a jury could reasonably find that they did.

When outgoing physical letters are intercepted or censored by prison officials, *Martinez* requires that the inmate be "notified of the rejection of [the] letter written by . . . him," and that he be "given a reasonable opportunity to protest that decision," with his complaint being "referred to a prison official other than the person who originally disapproved the correspondence." 416 U.S. at 418–

---

[5] *Thompson* constitutes binding precedent in the Eleventh Circuit under *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

19. In other words, "any decision to censor or withhold delivery of letters must be accompanied by procedural safeguards," such as notice and an opportunity to contest the decision to a different prison official. *See Perry*, 664 F.3d at 1367–68 & n.2.[6]

Mr. Benning submitted an affidavit stating that, when the emails to his sister were intercepted in September and October of 2017, he was denied (a) "any process" and (b) an "administrative remedy" to challenge the decisions because of SOP 204.10. *See* D.E. 80-5 at ¶ 14. That affidavit, based as it was on Mr. Benning's personal knowledge, sufficed to create an issue of fact. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc).

The evidence in the summary judgment record also supports the lack-of-notice and lack-of-remedy assertions. SOP 204.10 expressly states that "communications which violate [the] policy *will be* intercepted *without explanation*." D.E. 64-4, Attachment B-1 at 15 (emphasis added). Richard Wallace, a GDC supervisor, confirmed in his declaration that SOP 204.10 provides for no explanation when emails are intercepted for a violation. *See* D.E. 64-4, Exh. B at ¶ 13. Moreover, Ms. Patterson and Ms. Edgar stated in

---

[6] Our sister circuits read *Martinez* the same way. *See Vogt v. Wetzel*, 8 F.4th 182, 187 (3d Cir. 2021); *Hopkins v. Collins*, 548 F.2d 503, 504 (4th Cir. 1977); *Johnson v. El Paso Cnty. Sheriff's Dep't*, 51 F.3d 1041, at *5 (5th Cir. 1995); *Martin v. Kelley*, 803 F.2d 236, 243 (6th Cir. 1986); *Miller v. Downey*, 915 F.3d 460, 466 (7th Cir. 2019); *Ping v. Raleigh*, 205 F.3d 1347, at *1 (8th Cir. 2000); *McKinney v. De Bord*, 507 F.2d 501, 505 (9th Cir. 1974).

their declarations that they acted pursuant to SOP 204.10, and they did not claim that they notified Mr. Benning of their decisions or provided him with an administrative remedy. *See* D.E. 64-5, Exh. C at ¶¶ 10–12; D.E. 64-6, Exh. D at ¶¶ 11–13. It is therefore reasonable to infer that, in accordance with SOP 204.10, they did not tell Mr. Benning that his emails were intercepted and did not provide him with an appeal to a different GDC official.

Given this evidence, the district court should not have granted summary judgment in favor of Ms. Patterson and Ms. Edgar on whether they violated Mr. Benning's due process rights. Mr. Benning had a protected First Amendment liberty interest in his outgoing emails, and a reasonable jury could find that he was not provided any notice of the interceptions or of his right to challenge the decisions. *See Martinez*, 416 U.S. at 418–19; *Perry*, 664 F.3d at 1367–68 & n.2.

But that does not end the matter, for Ms. Edgar and Ms. Patterson asserted qualified immunity as to Mr. Benning's claims for damages for the alleged procedural due process violations. We therefore turn to qualified immunity.

## D

Government officials sued in their individual capacities for money damages "are entitled to qualified immunity with respect to 'discretionary functions' [they have] performed[.]" *Ziglar v. Abbasi*, 582 U.S. 120, 150 (2017). In intercepting and withholding Mr. Benning's three emails pursuant to SOP 204.10, Ms. Patterson and

Ms. Edgar were carrying out discretionary tasks.  As a result, Mr. Benning has the burden of showing that qualified immunity is inappropriate.  *See Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012).

In this case qualified immunity "turns on the 'objective legal reasonableness'" of the actions of Ms. Patterson and Ms. Edgar.  *See Ziglar*, 582 U.S. at 151 (citation omitted).  The Supreme Court recently summarized this aspect of the qualified immunity inquiry:

> Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  Although this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.  This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (internal quotation marks and citations omitted).  For purposes of qualified immunity, decisions of the Supreme Court, the Eleventh Circuit, or the appropriate state supreme court can announce clearly established law.  *See Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).

It is true, as Mr. Benning says, that by September and October of 2017—when his emails were withheld—some courts had applied *Martinez* to correspondence other than letters. *See, e.g., Bonner*, 552 F.3d at 677 (holding that *Martinez* applied to packages). This case, however, involves email correspondence, and "courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotations marks omitted).

Email is created and transmitted in a different medium than physical mail. Although we have concluded that the *Martinez* due process requirements apply to email correspondence in the prison setting, before today there were no Supreme Court, Eleventh Circuit, or Georgia Supreme Court decisions on point. As far as we can tell, only two district courts have specifically ruled that the *Martinez* due process framework governs emails generated by inmates, and those courts issued their decisions in June of 2020 and November of 2018, well after Ms. Patterson and Ms. Edgar intercepted Mr. Benning's emails. *See, e.g., Tory*, 2020 WL 2840163, at *4; *Emery v. Kelley*, 2018 WL 5779593, at *2 (E.D. Ark. Oct. 3, 2018), *report and recommendation adopted*, 2018 WL 5779505 (E. D. Ark. Nov. 2, 2018). So even if district court decisions from other jurisdictions could create clearly established law—they cannot and do not—those two cases do not help Mr. Benning overcome

qualified immunity because they post-dated the events in this case. *See Wesby*, 138 S. Ct. at 589.

In sum, at the time Ms. Patterson and Ms. Edgar acted there was no governing and materially similar precedent concerning the due process implications of confiscating, intercepting, or censoring outgoing emails generated by inmates. We recognize that a prior case on all fours (or nearly all fours) is not always necessary to give an official fair notice that his conduct is wrongful. *See, e.g., Taylor v. Rojas*, 141 S. Ct. 52, 53–54 (2020) (reversing grant of qualified immunity to officers who violated the Eighth Amendment by placing inmate in a "shockingly unsanitary" cells for six days). Although the issue is close, we conclude that this is not one of those cases where the lack of notice and procedural safeguards "so obviously violates [the] [C]onstitution that prior case law is unnecessary." *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019). The law, as it existed in September and October of 2017, did not place the constitutionality of the conduct at issue "beyond debate." *Wesby*, 138 S. Ct. at 590. *See also Crosby v. Paulk*, 187 F.3d 1339, 1344–45 (11th Cir. 1999) (explaining that qualified immunity gives government officials "the benefit of the doubt, provided that the conduct was not so obviously illegal in the light of then-existing law") (internal quotation marks omitted).

### E

In addition to seeking damages against Ms. Patterson and Ms. Edgar, Mr. Benning requested declaratory relief with respect to his due process claims. He asked that the district court issue a

judgment which declared (a) that he "has a right to be notified when email correspondence is censored," (b) that he "has a right to [the] written reasons for any decision to censor" his email correspondence, and (c) that he "has a right to respond to any decision to censor [his] email correspondence before the decision is finalized." *See* D.E. 28 at 6.[7]

As we have explained, qualified immunity "is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions," and "may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." *Ratliff v. DeKalb County*, 62 F.3d 338, 340 n.4 (11th Cir. 1995). *See also D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995) ("[B]ecause qualified immunity is a defense only to claims for monetary relief, the district court erred in granting summary judgment on plaintiffs' claims for injunctive and declaratory relief."). So the entitlement of Ms. Patterson and Ms. Edgar to qualified immunity with respect to damages does not resolve the requests for declaratory relief.

The district court, having rejected Mr. Benning's due process claims on the merits, did not have to confront the issue of

---

[7] Mr. Benning also requested that the district court issue a judgment which declared "inmate email correspondence" to be the same as "written/paper correspondence." *See* D.E. 28 at 6. Because Mr. Benning has not claimed that any particular policy within SOP 204.10 is unconstitutional in its differential treatment of email correspondence and written/paper correspondence, we do not consider this claim.

declaratory relief.  But we have held that a reasonable jury could find that Ms. Patterson and Ms. Edgar violated Mr. Benning's due process rights by intercepting his emails and by failing to provide him notice and an opportunity to appeal to a different GDC official. Those due process claims will have to be put to a jury so that the district court can address the propriety (and scope) of declaratory relief should Mr. Benning prevail.  *Cf. Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001) (explaining that the grant of qualified immunity to individual prison officials did not preclude an inmate "from going forward with his as-applied challenge to the Ohio prison grooming regulation insofar as he seeks declaratory and injunctive relief" to "prevent the defendants from forcibly cutting his beard and sidelocks in the future"); 1 Sheldon H. Nahmood, Civil Rights and Civil Liberties Litigation § 5:3 (2021-22 edition) (by "the terms of" the Declaratory Judgment Act, "neither injunctive relief nor damages need be sought as a condition precedent to obtaining a declaratory judgment").

We note that Mr. Benning asserted his due process claims against all of the defendants, including the Commissioner of the GDC.  *See* D.E. 28 at 11–12.  Insofar as he is being sued in his official capacity for declaratory relief, and due to his implementation of SOP 204.10, the Commissioner may not assert qualified immunity as a defense.  *See Kentucky v. Graham*, 473 U.S. 159, 167 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."); *Universal*

*Amusement Co. v. Hofheinz*, 646 F.2d 996, 997 (5th Cir. 1981) ("Government officials sued in their official capacity may not . . . assert [qualified] immunity as a defense.").

Although a prayer for declaratory relief generally seeks a declaration of both past and future conduct, the Supreme Court has explained that such relief is permitted in an official-capacity suit against a state official for prospective relief under *Ex parte Young*, 209 U.S. 123 (1908), because "[i]nsofar as the exposure of the State is concerned," it adds "nothing to the prayer for [an] injunction." *Verizon Md., Inc. v. Pub. Serv. Com'n of Md.*, 535 U.S. 635, 646 (2002). Mr. Benning did not seek injunctive relief as to his due process claims, but his requests for declaratory relief as to those claims are worded in the present tense, and do not simply seek a declaration of past wrongdoing. We therefore cannot say on this record that declaratory relief against the Commissioner is barred should Mr. Benning prevail on his due process claims. *See S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204 (11th Cir. 2019) ("Some suits requesting injunctive or declaratory relief against state officials are not considered suits against the state and thus are not barred by sovereign immunity.") (citing *Ex parte Young* and *Verizon Md.*). Should Mr. Benning prevail on his due process claims against Ms. Patterson, Ms. Edgar, and the Commissioner on remand, the district court will need to address the requests for declaratory relief.

## IV

We now pivot to Mr. Benning's First Amendment claims. Mr. Benning alleged that two of the policies set out in SOP 204.10—the prohibition on requesting forwarding to third parties and the prohibition on sending information about other inmates—violated his First Amendment rights. The parties, as they did below, debate which of two Supreme Court cases provides the proper standard for addressing the censorship of inmates' outgoing emails.

*Martinez*, which has been limited to outgoing correspondence, *see Thornburg*, 490 U.S. at 413, holds that "censorship of prisoner mail is justified" if "the regulation or practice . . . further[s] an important or substantial governmental interest unrelated to the suppression of expression" and if "the limitation of First Amendment freedoms [are] . . . no greater than is necessary or essential to the protection of the particular governmental interest involved." *Martinez*, 416 U.S. at 413. On the other hand, *Turner v. Safley*, 482 U.S. 78, 89 (1987), holds that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Mr. Benning argues that *Martinez* provides the governing standard, while the defendants assert that *Turner* governs.

### A

Mr. Benning alleged that two policies set out in SOP 204.10 violated his First Amendment rights under *Martinez*. As stated, these were the policy prohibiting inmates from asking recipients to

forward their outgoing emails (the forwarding policy) and the pol-
icy prohibiting inmates from discussing other inmates in their out-
going emails (the inmate-information policy). Mr. Benning did not
argue that he had an "independent, stand alone, right to electronic
correspondence if . . . no email service of any sort was offered by
the defendants." D.E. 80 at 6. Instead, he asserted that "[t]he stand-
ard to be applied for review of the censorship of outgoing elec-
tronic correspondence is the same as that for outgoing physical cor-
respondence set out in [*Martinez*]." *Id*. at 16. His position before
the district court was that the policies did not pass muster under
*Martinez*, and that summary judgment in favor of the defendants
was not appropriate because the record did not establish that the
restrictions were "no greater than necessary or essential to protect
important or substantial interests." *Id*. at 17.

The defendants responded that Mr. Benning did not have a
constitutional right to communicate through email. And they as-
serted that even if he had such a right, the challenged policies
would survive constitutional scrutiny under *Turner*. That is, they
argued that the two policies are "rationally related to [the] GDC's
security interest"—"[b]oth policies exist to curb criminal activity
and ensure security and are therefore 'rationally connected to
[GDC's] security and safety interests.'" D.E. 64-1 at 11–12. *See also*
D.E. 64-4, Exh. B at 7. Specifically, the forwarding policy "prevents
[inmates] from communicating with those who have not been
cleared by GDC's security personnel and who may have a record
of criminal activity," and the inmate-information policy "prevents

[inmates] from including information that could endanger the safety and security of anyone related or connected to the inmate named in [the] email." *Id.* at 11. The defendants further asserted that Mr. Benning had other means of communicating besides email (i.e., physical letters), that accommodating Mr. Benning's forwarding request would require the GDC to invest more resources "to do background checks on the limitless number of possible recipients that [inmates'] emails could be forwarded to," and that the prohibitions set forth by the policies "are not exaggerated responses to GDC's security concerns." *Id.* at 12–13.

Ms. Edgar and Ms. Patterson additionally argued that they were entitled to qualified immunity. In their view, "there [was] no clearly established law that would have put them on notice that performing their job responsibilities of withholding emails that did not comply with the email [policies] was clearly unlawful." *Id.* at 15.

The district court decided to apply the standard set out in *Turner* and ruled that the challenged policies were constitutional under that standard. The district court alternatively concluded that Ms. Patterson and Ms. Edgar were entitled to qualified immunity such that Mr. Benning would not be entitled to damages from them. *See* D.E. 108 at 10–29.

On appeal, the parties essentially restate the positions they took in the district court.

Mr. Benning makes three principal arguments. First, he maintains that *Martinez*—rather than *Turner*—provides the appropriate standard for reviewing restrictions on outgoing emails and that under *Martinez* issues of material fact preclude summary judgment. *See* Br. for Appellant at 28–42. Second, he contends that even if *Turner* applies material issues of fact exist as to whether the forwarding policy and the inmate-information policy are constitutional. *See id.* at 43–51. Third, he asserts that Ms. Patterson and Ms. Edgar are not entitled to qualified immunity. *See id.* at 59–60.

The defendants argue that "straightforward application of the *Turner* standard confirms that [the] GDC's modest email regulations are reasonably related to security and safety for inmates, security guards, and members of the public." Br. for Appellees at 13–14. They also contend that the district court correctly found that Ms. Edgar and Ms. Patterson were entitled to qualified immunity. *See id.* at 41–45.

## B

As set out earlier, the Supreme Court's cases provide that qualified immunity "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," and explain that for a right to be clearly established "existing precedent must have placed the statutory or constitutional question beyond debate. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Rivas-Villegas*, 142 S. Ct. at 7–8 (internal quotation marks and citations omitted).

We conclude that qualified immunity applies with respect to Mr. Benning's claims for damages against Ms. Patterson and Ms. Edgard.  In September and October of 2017, when Ms. Patterson and Ms. Edgar intercepted Mr. Benning's emails, there was no clearly established law (in the Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court) holding or indicating that the forwarding policy or the inmate-information policy (or similar policies) violated the First Amendment when applied to outgoing emails from inmates.  There was also no clearly established law addressing which First Amendment standard—the one in *Martinez* or the one in *Turner*—governs prison regulations like the ones at issue here.

Mr. Benning cannot point to any materially similar cases—and we have not found any ourselves—but he argues that a reasonable prison official would have understood that emails are a form of outgoing correspondence under *Martinez.  See* Br. for Appellant at 56.  But we have already rejected Mr. Benning's similar argument against qualified immunity with respect to the due process claims.  And the recognition that emails constitute correspondence for due process purposes says little about the constitutionality of the forwarding and inmate-information policies under the First Amendment.  Under the circumstances, the unconstitutionality of those policies was not "beyond debate."  *Wesby*, 138 S. Ct. at 590. *See also Rodriguez v. Burnside*, 38 F.4th 1324, 1334 (11th Cir. 2022) (granting qualified immunity, in a First Amendment free exercise case, to prison officials implementing policies that limited and

governed showers for inmates housed in a special management unit, and explaining that *Turner* drew no "bright lines" between lawful and unlawful policies).

Thus, because the law was not clearly established, we affirm the district court's ruling that Ms. Edgar and Ms. Patterson are entitled to qualified immunity on Mr. Benning's First Amendment claims for damages. In light of our decision, we need not and do not address the constitutionality of the forwarding and inmate-information policies.

## C

That leaves the First Amendment claims against the Commissioner in his official capacity. Mr. Benning did not seek declaratory relief on those claims, but he did seek certain injunctive relief. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) (explaining that *Ex parte Young* "allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law").

As relevant here, Mr. Benning requested that the district court (1) "order the defendants to not limit the length of outgoing emails," (2) "order the defendants to allow [him] to email anyone except for persons who have specifically requested to be restricted to [him]," and (3) "order the defendants to not impose restrictions on the use of [his] electronic communications by non-incarcerated persons." D.E. 28 at 13.

The district court denied Mr. Benning's claims for injunctive relief because they were moot or because they did not comply with the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1) (requiring, among other things, that injunctive relief as to prison conditions "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff" and be "narrowly drawn"). *See* D.E. 108 at 7–8.  Mr. Benning contends that the district court erred, but we disagree.

While the case was pending in the district court, the GDC rescinded the policy in SOP 204.10 preventing inmates from emailing anyone not cleared to physically visit them at their facility.  *See* D.E. 80-5 at 1.  The district court concluded that, as to this aspect of SOP 204.10, Mr. Benning's request for injunctive relief was moot.  *See* D.E. 108 at 7.  Mr. Benning does not challenge that conclusion on appeal, so we address only his other two requests, unrelated to monetary damages, for injunctive relief—ordering the GDC not to limit the length of outgoing emails and not to impose restrictions on the use of his communications by non-incarcerated persons.

Mr. Benning argues that the district court acted prematurely in rejecting his claims for injunctive relief, and asserts that it should have waited to see if he prevailed on any of his First Amendment claims.  *See* Br. for Appellant at 58–60.  If a preliminary injunction is not sought, it generally makes sense for a district court to leave the matter of equitable remedies until the end of the case.  At that point the court will know what claims, if any, the plaintiff has

prevailed on and will be able to determine the propriety and scope of injunctive relief. *See United States v. Baxter, Int'l, Inc.*, 345 F.3d 866, 909 (11th Cir. 2003).

Under Rule 54(c) of the Federal Rules of Civil Procedure, the "demand for relief in the pleadings does not limit, except in cases of default, the relief a court may grant when entering judgment." *Sapp v. Renfroe*, 511 F.2d 172, 176 n.3 (5th Cir. 1975). But "Rule 54(c) creates no entitlement to relief based on issues not squarely presented" in the pleadings. *Cioffe v. Morris*, 676 F.2d 539, 541 (11th Cir. 1982). The problem for Mr. Benning is that his requested injunctive relief bore no relationship to the First Amendment claims he asserted. As a result, even if he prevailed on the merits of those claims he would not have been entitled to the injunctive relief he sought.

"[T]he scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And that remains the case under the PLRA. *See* 18 U.S.C. § 3626(a)(1)(A) ("Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."). *See also Thomas v. Bryant*, 614 F.3d 1288, 1323 (11th Cir. 2010) (PLRA case: "[T]he case law has long established that the scope of an injunction should not exceed the identified violation."). With respect to his First Amendment claims, Mr. Benning requested an order prohibiting the GDC from limiting the length of outgoing emails and an order prohibiting the GDC from restricting

in any way how his emails are used by non-incarcerated persons. As to the first request, Mr. Benning never claimed that the GDC's limitation on the length of outgoing emails (one of the policies set out in SOP 204.10) was unconstitutional. As to the second request, SOP 204.10 does not by its terms place any limits on what recipients of inmate emails can do with them once they are received—the restriction is on the inmate asking recipients of emails to forward the communications—and in any event there was no allegation in the complaint that any such restriction was unconstitutional.

Although we review *pro se* filings liberally, we cannot "rewrite [a] . . . pleading" to request a different form of relief. *See Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168–69 (11th Cir. 2014). Given the complete lack of connection between the claims pled and the injunctive relief requested, the district court did not err in ruling that such relief was overbroad and inappropriate. *See* § 3626(a)(1)(A); *Thomas*, 614 F.3d at 1323. As with Ms. Patterson and Ms. Edgar, we do not address the constitutionality of the forwarding and inmate-information policies under the First Amendment.

## V

On Mr. Benning's due process claims, we affirm in part and reverse in part. Mr. Benning had a First Amendment liberty interest in his outgoing emails. As a result, he was entitled to procedural safeguards when his emails in September and October of 2017 were intercepted. Although Ms. Patterson and Ms. Edgar are entitled to

qualified immunity on Mr. Benning's requests for damages on the due process claims, those claims must be tried to a jury. The requests for declaratory relief on the due process claims are not barred by qualified or sovereign immunity, and a reasonable jury could find that the defendants—in promulgating and following SOP 204.10—violated Mr. Benning's due process rights.

With respect to Mr. Benning's First Amendment claims relating to the forwarding and inmate-information policies, we affirm. Ms. Patterson and Ms. Edgar are entitled to qualified immunity, and the requested injunctive relief against the Commissioner was not connected to the policies that Mr. Benning challenged.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

SCHLESINGER, District Judge, Concurring:

I concur in the result and agree with much in the majority opinion.  But I write separately because I would affirm the district court's determination that *Turner* rather than *Martinez* controls. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413–414 (1989).

This case presents an opportunity to address how prison officials should treat First Amendment issues.  The majority concludes, "under *Martinez* Mr. Benning had a protected liberty interest grounded in the First Amendment, in the emails he generated and sought to send to his sister."  Maj. Op. at 10.  But the issue is not so plain.  Other Circuits have recently addressed similar instances and have followed *Turner*.  *See Murdock v. Thompson*, No. 20-6278, 2022 WL 17352171, at *1 (4th Cir. Dec. 1, 2022) (relying on *Turner* to affirm the denial of an inmate's claim his right of access to the court was violated when he was prohibited from sending a "Motion for a Speedy Trial" by certified mail); *White v. True*, 833 F. App'x 15, 18 (7th Cir. 2020) (considering a First Amendment claim, in a *Bivens* action, of an inmate barred from sending mail to his daughter, but the court, citing *Turner*, determined "the restriction on outgoing mail" served "a legitimate penological interest"); *Sebolt v. Samuels*, 749 F. App'x 458, 459 (7th Cir. 2018) (citing *Turner* when addressing an inmate's contention his First Amendment rights were violated because he was denied access to the institution's email program because of his criminal history and

21-11982                Schlesinger, J., Concurring                    2

concluding inmates do not have an unrestricted First or Sixth Amendment right to receive publications or consult counsel by electronic mail); *Aguiar v. Recktenwald*, 649 F. App'x 293, 295 (3d Cir. 2016) (applying *Turner* to decide whether an inmate had "a constitutionally protected interest in the use and maintenance of his Facebook account").  While others have followed *Martinez*. *See Stow v. Davis*, No. 22-1264, 2023 WL 2944991, at *1 (1st Cir. Jan. 4, 2023) (applying *Martinez* standard when addressing a possible outgoing mail censorship question); *Bacon v. Phelps*, 961 F.3d 533, 543-44 (2d Cir. 2020) (concluding *Martinez* applied to a prison policy that allowed an inmate to be disciplined for a letter sent to his sister.).

It is for this reason, and to provide sharper guidance to district courts, I suggest we should have more fully developed whether *Turner* applies to Mr. Benning's claim.  In my view the challenged email policies survive constitutional scrutiny under *Turner*.